ML:JKW/RAS
F. #2021R00415

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100010993663381 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-MJ-935 <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian G. Gander, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for

information associated with Facebook user ID 100010993663381 (the "Subject Account") that is

stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a

social networking company headquartered in Menlo Park, California.  The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Facebook to disclose to the government records and other information

in its possession, pertaining to the subscriber or customer associated with the user ID.

2.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for

approximately eighteen years.  As such, I am a "federal law enforcement officer" within the

meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged

in enforcing the criminal laws and duly authorized by the Attorney General to request a search

warrant.  I am part of the Child Exploitation and Human Trafficking Task Force with the FBI

and New York City Police Department (the "Task Force").  I have extensive experience investigating cases relating to sex trafficking and sex trafficking of minors.  I have experience executing search warrants on electronically stored communications of the sort requested herein.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1591 (sex trafficking of a minor or by force, fraud, or coercion), 1594 (conspiracy to commit sex trafficking) and 2421 (the Mann Act) (the "Subject Offenses") have been committed by ELIJAH WUSU, also known as "Lucky," and others known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

I.      Background

5.      Since at least February 2020, the Task Force has been investigating ELIJAH WUSU, also known as "Lucky," for the Subject Offenses.  As part of its investigation, the Task Force has, inter alia, reviewed online advertisements for commercial sex, interviewed victims and obtained information from Internet and communications providers.  As set forth in more detail below, there is probable cause to believe that WUSU and others caused at least three victims to engage in commercial sex acts, including by threats of violence, and that WUSU received financial benefit from their victims' sex acts.  WUSU also attempted to recruit a minor,

Victim-4, to engage in prostitution on his behalf, although she did not end up working for him. Four of the victims, who are referred to herein as Victim-1, Victim-2, Victim-3 and Victim-4, were recruited on Facebook to work for WUSU.

6.      As set forth in greater detail below, there is probable cause to believe that WUSU is the user of the Subject Account, and there is probable cause to believe that WUSU regularly used Facebook accounts or directed others to use Facebook accounts to recruit victims, including Victim-1, Victim-2, Victim-3 and Victim-4, to engage in commercial sex acts on WUSU's behalf.  The Subject Account has also been associated through a common photograph with a Facebook account used to recruit Victim-1 to work for WUSU.  Accordingly, there is probable cause to believe that the Subject Account is used by WUSU or on behalf of WUSU in order to recruit victims to engage in commercial sex on WUSU's behalf.

        a.      <u>Victim-1</u>

7.      In or around February or March 2019, an adult victim ("Victim-1") received a Facebook message from an account with the Facebook username "Cash Vida."  Cash Vida told Victim-1 that Cash Vida lived in North Carolina and worked for "Lucky" in North Carolina, dancing, modeling, and doing dates.  Based on my training, experience, and involvement in this and other sex trafficking investigations, in context, I understand that "doing dates" means engaging in commercial sex acts with customers.  Cash Vida provided Victim-1 with a telephone number for Lucky and told Victim-1 to call Lucky.

8.      Shortly after receiving Lucky's phone number, Victim-1 called Lucky, who she subsequently identified in a photograph as being WUSU.  WUSU told Victim-1 that he would take care of Victim-1 if Victim-1 went on "dates," which Victim-1 understood to mean engage in

prostitution.  Victim-1 agreed.  WUSU then provided Victim-1 with another phone number to call him and paid for a cab to bring Victim-1 to WUSU's residence in Brooklyn.

9.      Thereafter, Victim-1 resided with WUSU at his residence in Brooklyn while Victim-1 engaged in commercial sex acts on WUSU's behalf.

10.     Victim-1 engaged in "out calls," which means that she would travel to customers' residences or hotel rooms that customers had booked to engage in commercial sex acts.  WUSU also had Victim-1 work out of hotel rooms approximately two times per week and arranged "car dates," where she would engage in commercial sex acts in cars.  WUSU paid for hotel rooms on at least one occasion.  WUSU bought boxes of condoms, which Victim-1 used with customers.  Victim-1 had approximately six to seven customers per day, many of them regular customers.  At WUSU's direction, Victim-1 charged customers between $90 and $200 depending on the sex acts involved and length of the interaction.  When Victim-1 met with a customer, the customer paid Victim-1.  At the end of the night, Victim-1 gave the money earned that day to WUSU, and WUSU gave Victim-1 a portion of the proceeds.

11.     WUSU was violent with Victim-1 on several occasions.  On one occasion, WUSU began beating Victim-1 while Victim-1 was asleep after WUSU went through Victim-1's phone and became angry about text messages exchanged between Victim-1 and a male.  On another occasion, Victim-1 tried to leave WUSU's apartment to go home.  Victim-1 relayed to law enforcement that when she left WUSU's apartment that day, she did not intend to return and did not intend to continue working for WUSU.  After Victim-1 left WUSU's residence, WUSU followed her outside, grabbed Victim-1 by the neck and choked Victim-1 until she fainted.

12.     Victim-1 worked for WUSU for approximately three weeks before leaving WUSU's residence.  In order to safely leave WUSU's residence, Victim-1 provided WUSU with

a false story about where she was going and indicted that she would return to WUSU's residence. After Victim-1 left WUSU's residence, WUSU contacted Victim-1 by phone and text, cursing at her because he wanted her to come back and make money. Victim-1 has not seen WUSU since she left.

13.    Victim-1 informed law enforcement that "Cash Vida" also contacted another adult victim ("Victim-2") via Facebook and Victim-2 then started working for WUSU.[1]  According to Victim-1, Victim-2 told Victim-1 that WUSU was behind the "Cash Vida" Facebook page.

   b.   Victim-3

14.    Based on my discussions with another adult victim ("Victim-3"), as well as my conversations with other law enforcement agents, I have learned that Victim-3 engaged in prostitution for WUSU beginning in or about January 2020 and ending in or about March 2020.

15.    In or around January 2020, Victim-3 was contacted via Facebook by an account with the username "Kash."  Kash appeared to be a female and communicated with Victim-3 via Facebook Messenger about "making money."  Based on my training, experience and involvement in this and other sex trafficking investigations, I believe that, in context, "making money" refers to engaging in commercial sex acts.  Subsequently, Kash provided Victim-3 with a phone number for an individual Kash identified as "Lucky."  Victim-3 identified a photograph of WUSU as the individual she knew as "Lucky."  After speaking with WUSU on the phone, Victim-3 went to WUSU's apartment in Brooklyn at WUSU's behest.

---

[1]    Based on my discussions with Victim-2, as well as my conversations with other law enforcement agents and witnesses, I have learned that Victim-2 has engaged in prostitution for WUSU intermittently since approximately 2019 and is currently working for WUSU.

16.     According to Victim-3, WUSU lived in the basement of a particular residence located in Brooklyn, New York.

17.     In or about January 2020, shortly after meeting WUSU, Victim-3 began to engage in prostitution for WUSU.  Victim-3 worked for WUSU every day, engaging in sex acts with paying customers during out calls and car dates, as well as on the "Penn Track," located in the vicinity of Pennsylvania Avenue in Brooklyn.  Based on my training and experience, as well as my participation in this investigation, I have learned that a "track" refers to an outdoor area, e.g., a street or thoroughfare, where individuals engaged in commercial sex services.

18.     While Victim-3 worked for WUSU, Victim-3 had approximately ten customers per day, four or five of whom were regular customers.  During this time, Victim-3 earned approximately $2,500 per day from prostitution.  WUSU instructed Victim-3 to get money from customers before engaging in sex acts with them.  Victim-3 gave the money from customers to WUSU immediately or left it near the television in WUSU's residence.  All of the money that Victim-3 made from prostitution went to WUSU.  WUSU paid for Victim-3's hair and nails, and he bought Victim-3 food and marijuana.

19.     While Victim-3 worked for WUSU, WUSU instructed Victim-3 that Victim-3 was not permitted to look at or speak with other males.  WUSU frequently told Victim-3 to "stay in pocket" because there were other pimps nearby.  Based on my training, experience and involvement in this and other sex trafficking investigations, I have learned that "stay in pocket" refers to working for one particular pimp; here, WUSU was instructing Victim-3 to work for him exclusively and to prevent her from being recruited by other pimps.

20.     Victim-3 also knows Victim-2.  Victim-3 described the relationship between WUSU and Victim-2 as a "boyfriend/girlfriend type manipulated relationship."  Victim-3 stated

that, in or about late February 2020, Victim-2 told Victim-3 that WUSU had punched Victim-2. Victim-3 observed Victim-2's face, which looked like it had been hit.

21.     WUSU often threatened to hit Victim-3 and once told Victim-3, "I'm going to smack the shit out of you."

22.     Victim-3 stopped engaging in prostitution for WUSU after Victim-3 was arrested during a car date in or about March 2020.

c.   Victim-4

23.     Based on my discussions with a minor victim ("Victim-4"), as well as my conversations with other law enforcement agents, I believe that in or around September 2018, when Victim-4 was approximately 17 years old, WUSU attempted to recruit Victim-4 to engage in prostitution.

24.     Victim-4 was introduced to Lucky through Facebook by Victim-4's Facebook friend identified as "Kashh Bunn."  After Kashh Bunn introduced Victim-4 to Lucky, Victim-4 met Lucky in person one time, when she went to his apartment on East 38th Street in the Flatbush neighborhood of Brooklyn.  At that time, Lucky forced Victim-4 to perform oral sex on him to determine whether he would allow Victim-4 to work for him.  After engaging in the sex act with Lucky, Victim-4 left Lucky's apartment and did not have any further in-person contact with Lucky.

25.     Lucky subsequently contacted Victim-4 repeatedly using various Facebook accounts.  Victim-4 blocked the Facebook accounts Lucky used to contact her.  Victim-4 was shown a photograph of WUSU and stated that the individual "looks familiar" and subsequently asked the interviewing agent if the individual in the photograph was "Lucky."

II.     The Subject Account

26.     There is probable cause to believe that WUSU or someone working at his behest used the Subject Account to recruit victims to engage in commercial sex on WUSU's behalf and there is probable cause to believe that there is evidence of the Subject Offenses in the Subject Account.

27.     Specifically, there is probable cause to believe that WUSU is the user of the Subject Account.  The Subject Account was registered with Facebook in January 2016. Facebook provided law enforcement login information for the Subject Account for the period of October 29, 2019 through April 9, 2020, as well as the period April 3, 2021 through May 19, 2021.  The two most used IP addresses for these time periods for the Subject Account are tied to 889 East 38th Street in Brooklyn, New York, an address where I know WUSU to reside and where, based on the victims' descriptions of the location and physical set-up of WUSU's residence, I believe Victim-1, Victim-3 and Victim-4 met with and/or lived with WUSU while working for him.

28.     As set forth in detail above, Victim-1, Victim-2, Victim-3 and Victim-4 were each recruited on Facebook to work for WUSU.  Victim-1 and Victim-2 were each contacted by a Facebook account with username "Cash Vida," Victim-3 was contacted by a Facebook account with username "Kash," and Victim-4 was contacted by a Facebook account with username "Kash Bunn."  Based on my training and experience, I am aware that individuals engaged in sex trafficking often use Facebook and other social media platforms to find and recruit victims to engage in sex acts on their behalf.  I also know that Facebook user can make changes to the

username associated with their account.[2]  I am aware that individuals engaged in sex trafficking often use multiple Facebook accounts to reach out to victims and frequently change their usernames on Facebook to make it more difficult to trace their activities.

29.     The most recent username for the Subject Account is "Vida Vida."  Under the Subject Account's username, it states: "My Hoeness is Not Free . . . Expensive."  Based on my training and experience, I understand "hoeness" to refer to an individual who is engaging in prostitution.  Below is a screenshot of Subject Account's profile page as of August 5, 2021.



30.     On or about January 20, 2021, law enforcement showed Victim-1 a publicly available photograph from the "Photos" section of the Subject Account.  Victim-1 identified the female in the photograph as being the same female associated with the "Cash Vida" Facebook account, which had recruited her.  In addition, publicly available information shows that at some

---

[2]     A Facebook user cannot change their user identification number.

point, Victim-1 "liked" this photograph on the Subject Account, which shows that Victim-1 has had prior contact with the Subject Account.

31.     On or about June 26, 2021, I sent a preservation request to Facebook for the Subject Account.

Technical Background on Facebook

32.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

33.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

34.     A Facebook user cannot change their user identification number; however, a user can customize the web address for their profile by choosing a username.  The user can make changes to this username.[3]

35.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual

---

[3]     https://www.facebook.com/help/1740158369563165/?helpref=hc_fnav.

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11

38.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

39.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

40.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

42.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

45. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like

Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51.     Based on the foregoing, I request that the Court issue the proposed search warrant.

52.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

53.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

54.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

### **REQUEST FOR SEALING**

55.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to the target of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,



_____
Brian G. Gander
Special Agent
Federal Bureau of Investigations


Subscribed and sworn to before me via telephone
on ____August 9, 2021_____, 2021

_____████████_____
HONOR███████LSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

16

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID 100010993663381 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession,
custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is
located within or outside of the United States, including any messages, records, files, logs, or
information that have been deleted but are still available to Facebook, or have been preserved
pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the
following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user

identification number, birth date, gender, contact e-mail addresses, physical

address (including city, state, and zip code), telephone numbers, screen names,

websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts

and other Facebook activities from August 30, 2018 through the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them from August 30, 2018

through the present, including Exchangeable Image File ("EXIF") data and any

other metadata associated with those photos and videos;

(d)     All profile information; information regarding changes in account usernames or

vanity names; News Feed information; status updates; videos, photographs,

articles, and other items; Notes; Wall postings; friend lists, including the friends'

Facebook user identification numbers; groups and networks of which the user is a

member, including the groups' Facebook group identification numbers; future and

past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and

information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers

associated with, or used in connection with, that user ID, including the hardware

model, operating system version, unique device identifiers, mobile network

information, and user agent string;

(f)     All other records and contents of communications and messages made or received

by the user from August 30, 2018 through the present, including all Messenger

activity, private messages, chat history, video and voice calling history, and

pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook

posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from August 30, 2018

through the present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)     All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government

within 14 days of issuance of this warrant.

3

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 1591 (sex trafficking of a minor or by force, fraud, or coercion), 1594 (conspiracy to commit sex trafficking), and 2421 (the Mann Act) (the "Subject Offenses"), involving ELIJAH WUSU, also known as "Lucky," from August 30, 2018 through the present, including, for the user ID identified on Attachment A, information pertaining to the following matters:

(a)  Communications, records, or activity concerning prostitution;

(b)  Communications, records, or activity concerning the recruitment or grooming of victims (both identified and unidentified) of the Subject Offenses;

(c)  Communications, records, or activity regarding the planning, execution, and cover up of the Subject Offenses;

(d)  Communications with co-conspirators regarding the Subject Offenses;

(e)  Communications, records, or activity concerning ELIJAH WUSU, also known as "Lucky," and any of their co-conspirators;

(f)  Photographs, videos, images, audio, and other content relating to victims (both identified and unidentified) or the Subject Offenses;

(g)  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(h)  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

4

(i)  Evidence relating to changes to the Subject Account's usernames or vanity
names;

(j)  The identity of the person(s) who created or used the user ID, including records
that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other
records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and
instrumentalities described in this warrant.  The review of this electronic data may be conducted
by any government personnel assisting in the investigation, who may include, in addition to law
enforcement officers and agents, attorneys for the government, attorney support staff, and
technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed
electronic data to the custody and control of attorneys for the government and their support staff
for their independent review.

5

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

6

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                         Signature